IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Stephanie Alatorre-Verdugo,<br><br>    Defendant. | No. CR17-0770-TUC-RCC(LAB)<br><br>**REPORT AND RECOMMENDATION RE: MOTION TO SUPPRESS EVIDENCE** |

The District Court referred this case to the Magistrate Judge for a hearing on the defendant's motion to suppress evidence.  The defendant, Stephanie Alatorre-Verdugo, argues that all evidence obtained as a result of a search of her person on 4/18/17 must be suppressed because she was searched without probable cause and her consent to search was involuntary, in violation of her Fourth Amendment rights. (Doc. 51).

An evidentiary hearing was held on 5/8/18 and 5/18/18. On 5/8/18, Division Chief Raleigh Leonard testified as an expert witness, primarily in a separate motion regarding the constitutionality of the checkpoint.  Border Patrol Agents (BPA) Gilbert Serna and Emily Tietji also testified.  On 5/18/18, the defendant testified and BPA Tietje testified in rebuttal.  Defense exhibits 50 through 58 and Government's exhibits 2 through 29, 38 and 63 were admitted by stipulation of the parties.  Government's exhibits 1, 33 and 34 were admitted over the defendant's objection.

**Charges**:

The defendant is charged in a three count indictment with conspiracy to possess

with intent to distribute methamphetamine and heroin, possession with intent to distribute methamphetamine, and possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(viii) and 841(b)(1)(B)(i).

**Motion to Suppress**:

The defendant argues that her Fourth Amendment rights were violated when she was removed from a shuttle transport at the Border Patrol immigration checkpoint on Interstate 19. In the secondary inspection area, she was asked by BPA Serna if she would agree to be searched based on her failure to make eye contact. She claims that her consent was involuntary and that the search went beyond the scope of her consent, such that any evidence obtained as a result of the search must be suppressed.

The Court concludes the defendant gave voluntary consent to search her person and never rescinded her consent. Once the agent felt a hard object in the defendant's groin area there was probable cause to complete the search. When packages of illegal narcotics were discovered concealed in the defendant's groin and bra area there was probable cause to arrest her. Therefore, the evidence is admissible at trial.

**EVIDENCE**:

***Raleigh Leonard*** testified that he is a Division Chief of law enforcement operational programs in the Tucson Sector of the Border Patrol. He has been employed by Border Patrol for 28 years. He testified primarily as an expert for the government regarding the primary purpose of the I-19 Border Patrol Immigration Checkpoint, which is the subject of a separate motion.

As pertains to the motion to suppress, Mr. Leonard testified that according to the National Standards for Searches (Ex. 30), an agent should be able to explain to a detainee in Spanish what is happening during a search. T1[1], p. 85-86, lns. 19-25, 17-19; p. 88, lns. 17-21. The National Standards require that the search instructions be communicated in a language or manner that the detainee can understand. Agents do not ask for consent to search without suspicion. T1, p. 91, lns. 19-22. Per the I-19 standard operating

---

[1] T1 refers to the transcript from 5/9/18. T2 refers to the transcript from 5/18/18.

- 2 -

procedures (Ex. 31), there must be a minimum of four agents stationed at the secondary inspection area of the checkpoint, although there could be more. T1, p. 95, lns. 9-16. The procedures also require at least two marked pursuit vehicles near secondary inspection. T1, p. 96, lns. 7-10.

All shuttles and large multi-person conveyances are sent to secondary inspection because it is unsafe and impractical to determine the immigration status of numerous people if they remain in the vehicle, and it is unsafe to remove the passengers in primary inspection. T1, p. 60, lns. 13-17, 22-23; T1, p. 61, lns. 1-2, 9.    Removing passengers from vehicles at secondary inspection extends the time frame beyond an inspection of a vehicle with only two people in it, but the impact on the individual is the same.  T1, p. 107, lns. 7-14.  Individuals being inspected are not free to leave, which is stated on a sign at the checkpoint. T1, p. 108, lns. 11-20; Ex. 63. People being inspected are detained briefly to determine their right to be in the country.

There are signs about ¾ of a mile before the checkpoint advising people to slow down and alerting them that they are approaching the Border Patrol checkpoint. T1, p. 22, lns. 11-16.  The checkpoint is located on the northbound lanes of I-19. Id. at lns. 11-12.

*Gilbert Serna* testified that he has been a U.S. BPA for 13 years, stationed primarily at the Nogales station.  He has received training in drug recognition and how people smuggle drugs into the United States, including the *modus operandi* of "body carriers". They often wear two or three layers of underwear or compression shorts and conceal the contraband between the layers. T1, p. 27, lns. 8-15. Females will conceal items in the bra, groin, abdominal and inner thigh areas. Id. at lns. 19-21. They wear dresses or loose-fitting shirts. Id. at ln. 22.

Working at the I-19 checkpoint, Agent Serna's primary duty is to check the status of all people traveling north, although he is designated to investigate other crimes which he addresses if he becomes aware of them.  T1, p. 129, lns. 2-6. He checks and inspects every motorist by asking where they were born and where they are coming from.  He asks to see their documents if they are not United States citizens (USC).  The encounters

last 30 seconds or less. T1, p. 130, lns. 3-5.

Agent Serna has worked exclusively at the I-19 checkpoint since 10/16.  Prior to that, he worked the checkpoint intermittently.   He has worked at both primary and secondary inspection.  All shuttles are referred to secondary because it is not safe to remove passengers in the primary inspection traffic lane and it's hard to see into the van windows which are tinted and have writing on them. T1, p. 139, lns. 1-10.  Inspection of shuttle passengers in the secondary area takes about 2 to 3 minutes if there are no issues. T1, p. 138, lns. 8-11. Secondary inspection allows agents more time to talk to passengers, inspect their documents and investigate anything unusual.

On 4/18/17, BPA Serna was working at the I-19 checkpoint in secondary inspection when he encountered the defendant. T1, pp. 139-140, lns. 21-25, 1-5.  He made an in-court identification of Ms. Alatorre-Verdugo as a shuttle passenger whom he encountered walking out of the shuttle.T1, pp. 140, lns. 13-15, 22-23.  Ms. Alatorre-Verdugo presented a U.S. passport card, T1, p. 141, lns 2-3, although she avoided eye contact, leading Agent Serna to suspect that something wasn't right, T1, p. 140, lns. 23-25.  Most people present their documents, state their citizenship and look the agent in the eye, unless they're trying to conceal something. T1, p. 159, lns. 22-24; p. 159, lns. 9-12, 22-24; p. 160, lns. 2-10.  However, on cross-examination Agent Serna conceded that it can be suspicious when a person looks at him or avoids eye contact,  T1, p. 161, lns. 4-6. Ms. Alatorre-Verdugo was being obedient. T1, p. 162, lns. 2-3.

Agent Serna spoke Spanish to Ms. Alatorre-Verdugo in a conversational tone. T1, pp. 141, 142, lns. 12-13, 19-21. He was wearing his uniform and a firearm that was holstered.  T1, p. 142, lns. 3-5, 14-18. There were approximately 5 other agents in the inspection area who were also in uniforms and armed, but none of them were very close by. T1, p. 144, lns. 2-6. There were about five law enforcement vehicles in the immediate area that the defendant would have been able to see. T1, p. 183, lns. 1-9.  After a minute or less of conversation, BPA Serna asked Ms. Alatorre-Verdugo for her consent to search her by asking in Spanish, "Is it okay for my partner to search you?" T1, p. 145, lns. 4-7;

- 4 -

p. 163, lns. 24-25.  He did not explain what the search was for, tell her that she could refuse consent or tell her he could get a warrant. T1, 145, lns. 18-20; p. 148, lns. 15-17; p. 149 lns. 9-11.  She was not handcuffed. T1, p. 145, lns.10-12. There were no threats or promises. T1, p. 149, lns. 12-16. Ms. Alatorre-Verdugo was told that a female agent would search her. T1., p. 145, lns. 16-17.  She was not free to leave, as stated on a sign outside the shed. (Ex. 52), T1, p. 180, lns. 7-9.

Ms. Alatorre-Verdugo walked to the shed with Agents Tietje and Serna, with the latter at her side. T1., pp. 180-181, lns. 22-15, 1. The search was conducted by BPA Trainee Emily Tietji  in a small shed that is 10 to 15 feet from where the initial discussion took place, (Ex.16); T1, p. 151, lns. 14-16; pp. 149-150, lns. 25, 1-2, within five minutes or less from the initial contact. T1, p. 151, lns. 7-10. There are no windows or lights in the shed. T1, p. 151, lns, 11-14.  It consists of one room and is private, even though the door was left open for light. (Exs. 50, 51); T1, p. 150, lns. 9-10, 15-16.  BPA Serna stayed outside. T1, p. 150, ln. 22. He could not see in.  T1, p. 151, lns. 21-23. He never touched the defendant. T1, p. 151, lns. 4-6.  Agent Serna could speak with Agent Tietji if he used a loud tone. T1, pp. 151-152, lns. 24-25, 1.

Agent Tietji said she felt a hard object in the defendant's groin area.  T1, p. 152, lns. 2-6. Agent Serna instructed Agent Tietji to ask the defendant what it was.  T1, p. 152, ln. 11.  The defendant did not answer. T1, p. 152, ln. 13. Agent Tietji told Agent Serna that the defendant had three layers of underwear on.  T1, p. 152, lns. 19-20. Agent Serna instructed Agent Tietji to bring the defendant out. T1, p. 152, ln. 24. He asked Ms. Alatorre-Verdugo in Spanish why she was wearing three pairs of underwear. T1, p. 153, ln. 20. She said it was because she was on her menstrual cycle. T1, p. 153, ln. 22. Agent Tietji said the defendant was lying and Agent Serna thought so as well since he knows that body carriers wear multiple layers of underwear to conceal drugs. T1, pp. 153-154, lns. 24-25, 1-3.  Agent Serna translated for Agent Tietji so the defendant could understand.  He does not know Agent Tietji's Spanish proficiency. T1, p. 166, lns. 1-6. She was a trainee from the Sonoita station, brought to experience one of the busiest

checkpoints in the United States. T1, pp. 164-165, lns. 23-25, 1-2.

Agent Serna instructed Agent Tietji to take the defendant back into the shed and have her remove the extra layers of clothing so Agent Tietji could find the object. T1, p. 154, lns. 6-8. During this second conversation Agent Serna did not raise his voice, did not touch his firearm, made no threats or promises, did not explain to Ms. Alatorre what Agent Tietje was looking for and did not explain how the search would be conducted. T1, pp. 154-155, lns. 9-25, 1-5.  If a person changes his/her mind about the consent search, the agents stop searching. T1, p. 193, lns. 21-24.

Agent Tietji found a bundle between the first and second layers of clothing, closest to the defendant's body, T1, p. 194, lns.13-16, and called Agent Serna in to see it. T1, p. 155, lns. 11-13. Ms. Alatorre-Verdugo was asked to remove any additional bundles. T1, p. 155, lns. 20-21. She removed two bundles from her bra. T1, p. 155, lns. 22-25.  The package from her groin contained methamphetamine. T1, p. 156, lns. 5-7.  The packages from her bra contained heroin. Id.  Ms. Alatorre-Verdugo was arrested. T1, p. 156, ln. 11.

Agent Serna was confused about whether he instructed Agent Tietje to conduct a strip search and whether a strip search was in fact conducted. T1, p. 157, lns. 8-10, lns. 14-17; p. 158, lns. 14-15.  If it was a strip search, it was not conducted pursuant to policy. T1., p. 168, lns. 4-9, 19-20.

***Emily Tietje*** testified that she has been a U.S. Border Patrol agent for a year and a half.  Her training included two months of Spanish. T1, p. 197, lns. 14-15.  She was also trained regarding how drug trafficking organizations attempt to smuggle drugs through checkpoints and where body carriers conceal drugs. T1, p. 198, lns. 13-23.  Women hide drugs in the groin and breast area.  T1, p. 199, lns 2-3.

The week of 4/17/17, Agent Tietje worked at the I-19 Border Patrol checkpoint as part of her field training, T1, p. 199, lns. 4-10, including working in secondary inspection. T1, p. 201, lns. 23-25.  All shuttle vans are referred to secondary. T1, p. 203, lns.9-11.  Agent Tietje encountered Ms. Alatorre-Verdugo in secondary inspection on 4/18/17.  Id. at lns. 15-21.   She identified the defendant in court. T1, p. 204, lns. 4-6.

During the encounter with Ms. Alatorre-Verdugo, Agent Tietje was wearing her duty uniform, including her service firearm, which was always holstered. T1, p. 205, lns. 1-4, 9-10, 16-18.  Only Agents Tietje and Serna interacted with the defendant. T1, pp. 205-206, lns. 25, 1.

Agent Serna walked Ms. Alatorre-Verdugo over to Agent Tietje, who was speaking with another shuttle passenger, and asked her if she would conduct a consent patdown search.  T1, p. 206, lns. 7-10.  Agent Tietje walked ahead of the defendant, with Agent Serna following, to the shed used to patdown females. T1, p. 207, lns.16-20.  No one touched Ms. Alatorre-Verdugo as she walked to the shed. T1, p. 208, lns. 4-9.  The shed was maybe 20 yards away. T1, p. 209, lns. 6-8.  It measures about 10 by 15 feet in size. Id. at ln. 13; Ex. 16. It is one room with no lights or windows and provides privacy. T1, p. 210, lns. 1-8.

Once in the shed, Agent Tietje turned Ms. Alatorre-Verdugo away from her, had her place her hands on the back of her head and the agent stood behind the defendant and conducted the patdown. T1. p. 210,  lns. 11-13.  Agent Tietje's directions to the defendant were with hand gestures. T1, p. 213, lns. 8-10.  The defendant complied. T1, p. 211, ln. 4. Agent Tietje stood behind Ms. Alatorre-Verdugo, had a hold of her hands on the back of her head, placed one of her legs on the inside of the defendant's leg and conducted the patdown. T1, p. 214, lns. 16-18.  The patdown was over the clothing. Id. at lns. 22-23.  Over the breast and inside of the leg, Agent Tietje used the back of her hand. T1, p. 215, lns. 22-24.  She was looking for anything hard,  sharp-edged, boxy, or any anomaly. T1, p. 216, lns. 2-6.

On the inside of Ms. Alatorre-Verdugo's leg, near her groin, "there was a very hard, unnatural object." T1, pp. 216-217, lns. 25, 1-2.  Agent Tietje did not know what it was.  T1, p. 217, lns. 23-25.  Ms. Alatorre-Verdugo gave no indication that she did not want to go through with the search. Id. at lns. 20-22.  Once she felt the object, Agent Tietje felt she had probable cause to continue the search.  T1, p. 218, lns 1-3.  Agent Tietje had the defendant step out of the shed to speak with Agent Serna, who was waiting

just outside the door,  Id. at lns. 9-10, 20-21, so Agent Serna could speak with her in Spanish. T1, p. 219, lns. 13-17.

Ms. Alatorre-Verdugo told Agent Serna that she had her period so she was wearing extra layers of underwear. T1, p. 221, lns. 12-15.  During this conversation, Ms. Alatorre-Verdugo was avoiding answering questions, wouldn't look at anybody and was exhibiting a lot of nervous cues.  T1, p. 222, lns.16-18.  Ms. Alatorre-Verdugo followed Agent Tietje back into the shed and lowered the first layer of compression shorts, as she had been instructed to do by Agent Serna in Spanish. T1, p. 223, lns. 9-12, 19-25.  Agent Tietje was a few feet away from the defendant. T1, p. 224, lns. 6-7.  She saw nothing after the defendant removed the first layer of clothing so she had her remove a second layer which revealed a cellophane wrapped bundle between her legs.  Id. at lns. 6-10.  Ms. Alatorre-Verdugo handed the bundle to Agent Tietje. Id. at lns. 10-13.  Agent Tietje had the defendant turn around, and she conducted another patdown which led to the discovery of two additional cellophane packages in the defendant's bra.  Id. at lns. 23-25.  She asked Ms. Alatorre-Verdugo to remove the packages and hand them to her.  T1, pp. 224-225, lns. 25, 1.  Agent Tietje used hand gestures to instruct the defendant to lift up her dress and remove her underwear. T1, p. 242, lns. 3-7. The defendant did nothing to indicate that she did not want to lift her dress up.  Id. at lns. 8-10.

On rebuttal, Agent Tietje testified that she only encountered Ms. Alatorre-Verdugo after Agent Serna walked her over to her location. T2, p. 44, lns. 11-13. There were no other agents standing in view of the shed's doorway.  T2, p. 50, lns. 9-13. She did not bring Ms. Alatorre out of the shed a second time before the package was discovered.  Id. at lns. 20-24. Since the time of this incident, Agent Tietje has conducted over 50 searches and encountered many individuals at the checkpoint where she works.  T2, p. 53, lns. 5-8. Her report is only about half a page long, but she remembers this case because it was her first body carrier discovery in her career. T2 pp. 53, 54, lns. 9-11, 8-16.

***Stephanie Alatorre-Verdugo*** testified that she was 18 years old in April 2017. T2, p. 9, lns. 24-25. She is about 5'1" tall, weighs about 120 pounds and grew up in Mexico,

although she was born in the United States. T2, p. 10, lns. 3-15. At the time of this incident she was living with her parents and attending school. Id. at lns. 21-24. Her primary language is Spanish and she did not understand English well. T2, p. 11, lns. 4-8. Previously she had never been searched by a police officer or been told she had the right to refuse consent to search. T2, pp. 12-13, lns. 4-6, 11-14.

When Ms. Alatorre-Verdugo first got off the shuttle van, she was initially approached by Agent Tietje. T2, pp. 15-16, lns, 25, 1-3. Agent Tietje spoke to the defendant in English, which Ms. Alatorre-Verdugo did not understand. T2, p. 16, lns. 6-11. Agent Serna next spoke to her, in Spanish, and asked immigration questions. T2, pp. 16-17, lns. 14-16, 24-25, 1-3. Only Agents Serna and Tietje spoke to Ms. Alatorre-Verdugo. T2, p. 17, lns. 14-17. Agent Serna established that she was a U.S. citizen and then asked if Agent Tietje could search Ms. Alatorre-Verdugo. Id. at lns. 10-17. The agents never drew their weapons or made any threats or promises. Id. at lns. 19-25. She was not arrested before the search. T2, p. 19, lns. 9-11. Ms. Alatorre-Verdugo never told the agents that she didn't want to be searched or to stop the search. Id. at lns. 15-19. She never complained that she did not consent. T2, p. 20, lns. 12-15. Agent Tietje never put her hand under the defendant's clothing and no one told her she was required to consent to the search. T2, p. 19, lns. 20-25. During the patdown in the shed, Agent Tietje's hands were outside her clothing. T2, p. 20, lns. 16-19.

Ms. Alatorre-Verdugo did not believe she could say no to Agent Serna because he is the authority and that is what she learned growing up in Mexico. T2, p. 21, lns. 1-8. She thought if she said no, they would get mad and search her anyway. Id. at lns. 9-12. She saw dogs and about 7 other agents nearby. T2, pp. 21-22, lns, 13-18, 20-22, 1. She saw law enforcement vehicles and buildings at the checkpoint, all of which made her feel intimidated and as if she could not just walk away. T2, p. 22, lns. 1-11.

When Agent Serna asked for consent to search, Ms. Alatorre-Verdugo thought she would be searched in place, in view of her fellow passengers, not in a shed. T2, p. 22, lns. 18-23. She did not think the search would involve an agent touching her breasts and

groin.  T2, p. 23, lns. 1-3.  The female agent gestured for her to follow her to the shed, with Agent Serna walking nearby. T2, pp. 24-25, lns. 19-23, 25, 1-4. Ms. Alatorre-Verdugo was given instructions about what to do through hand gestures.  T2, pp. 26-27, lns. 25, 1-2.  She spread her legs when the agent pushed them apart with her foot.  T2, p. 27, lns. 16-17.  Ms. Alatorre-Verdugo felt uncomfortable when the agent touched her breasts and groin.  T2, p. 28, lns. 3-8.  The agent gestured to Ms. Alatorre-Verdugo to follow her to the door of the shed. T2, p. 29, lns. 18-23.  Agent Serna explained that Agent Tietje wanted to make sure everything was okay. T2, p. 30, lns. 4-7.  They went back into the shed. Id. at ln. 23.  The defendant thought that if she tried to walk out of the shed, the agents would have grabbed her and continued the search.  T2, p. 31, lns. 12-18.  Once back in the shed the agent searched the same as the first time.  T2, p. 33, lns. 5-7.  Agent Tietje asked the defendant in Spanish, "What is this?" but the defendant did not answer. T2, p. 34, lns. 6-9.  They went outside again and Agent Serna explained that Agent Tietje felt something hard and wanted to check to see if everything was okay.  T2, pp. 34-35, lns. 11, 24-25, 1-2.

Ms. Alatorre-Verdugo explained that she was wearing several layers of underwear because she was menstruating. T2, p. 35, lns. 7-9.  When instructed to go back into the shed the defendant said okay and did so. T2, p. 36, lns. 1-5.  She waited for instructions until Agent Tietje gestured for her to lift up her dress. Id. at lns. 14-17.  Ms. Alatorre-Verdugo saw two male agents talking at the door so she did not lift her dress, as instructed.  T2, pp. 36-37, lns. 24-25, 1, 7-8, 12, 17-19.  She pointed to the door to show the agent she was uncomfortable.  T2, pp. 37-38, lns 23-25, 1-2.  Agent Tietje responded by gesturing for Ms. Alatorre-Verdugo to move further back, at which time the defendant lifted her dress. T2, pp. 38-39, lns. 21-23, 16-18.  Agent Tietje gestured for Ms. Alatorre-Verdugo to remove her underwear. T2, p. 39, lns. 22-24.  The defendant removed the first layer of underwear, doing nothing to stop the search.  T2, pp. 40-41, lns. 25, 1-5.  She was then asked to remove the second layer. T2, p. 40, ln. 12. The agent did not touch the defendant. Id. at lns. 13-15.  Agent Tietje removed the package from the defendant's

body. T2, p. 41, lns. 6-8.  The entire search took about 15 to 20 minutes. Id. at lns. 12-15.

**DISCUSSION**:[2]

The Fourth Amendment protects people from unreasonable searches and seizures. A warrantless search is per se unreasonable unless the government can establish that one of the clear exceptions applies.  U.S. Const., Am. IV, *Katz v. U.S.*, 389 U.S. 347, 357 (1967).  Consent is an exception to the warrant requirement and is relied upon by the government in the present case.  *Id.*  A search at a checkpoint must be supported by either probable cause or consent.  *U.S. v. Preciado-Robles*, 964 F.2d 882, 882, 885 (9th Cir. 1992) (citing *U.S. v. Martinez-Fuerte*, 428 U.S. 543, 567 (1976)).  The government bears the burden of establishing that consent was freely and voluntarily given, based on the totality of circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

The request for consent to search in the present case was based only on lack of eye contact with Agent Serna during the initial encounter in secondary inspection.  There was no probable cause to search the defendant at that moment.  However, none was needed because Ms. Alatorre-Verdugo gave consent to search.  The only issues are whether the consent was voluntary and whether the search went beyond the scope of consent.

In determining whether consent is voluntary, the Ninth Circuit has identified five factors that the Court should consider.  The factors are: (1) whether the defendant was in custody, (2) whether the officers had guns drawn, (3) whether *Miranda* warnings were given, (4) whether the defendant was advised of the right to refuse consent, and (5) whether the defendant was told a search warrant could be obtained. *Preciado-Robles*, 964 F.2d at 885.

Ms. Alatorre-Verdugo was not in custody, although she was not free to leave.  A checkpoint stop is a seizure for Fourth Amendment purposes.  *Martinez-Fuerte*, 428 U.S. at 556.  The officers did not have guns drawn, and never touched or unholstered their weapons.  No *Miranda* warnings were given, but they were not required for the brief

---

[2] There were small discrepancies in the testimony between the agents and the defendant. Those had no impact on the Court's analysis. The Court finds all witnesses to be credible.

questioning routinely conducted at a permanent checkpoint; the defendant was not under arrest.  *U.S. v. Torres-Sanchez*, 83 F.3d 1123, 1130 (9th Cir. 1996).  The defendant was not advised that she could refuse consent.  She was not told that a search warrant could be obtained.

Other factors considered by the Court in the totality of circumstances voluntariness analysis are that the defendant was only 18 years old at the time of the incident.  She stands about 5'1" tall and weighs about 120 pounds.  She lived with her parents and had not finished high school.  She did not speak or understand English.  She was raised in Mexico where she was taught to obey authority.  There were about 7 agents in the immediate area of the checkpoint, although she only interacted with two agents, a male and a female.  There were several marked Border Patrol vehicles and a canine within view.  The checkpoint is on a public roadway with signs giving notice to travelers well ahead of time that they will be stopped and inspected.

Agent Serna asked Ms. Alatorre-Verdugo in Spanish if the female agent could search her.  He did not explain the procedure or extent of the search, nor where the search would be conducted.  Neither did Ms. Alatorre-Verdugo ask.  She may have been afraid and intimidated but that was not because of the agents' conduct.  They never raised their voices or threatened her, or promised her anything in exchange for her consent.  She was not handcuffed.  She did not hesitate to follow the agents to the shed, which was an accommodation for her privacy.  The agents did not touch her as she walked on her own to the shed. She never complained or indicated that she wanted to stop the search.  She was compliant.  She did not know that the patdown over her clothing would involve the agent touching her breasts and groin with the back of her hand, but she did nothing to alert the agent that she wanted her to stop.

It is clear that Ms. Alatorre-Verdugo understood that she could raise concerns or objections to the search because she testified that when Agent Tietje gestured for her to raise her dress, and she saw two male agents in the doorway of the shed, she did not raise her dress.  She pointed at the men and Agent Tietje addressed her concern by moving her

further back into the shed so it would be more private.  There is no evidence that she was threatened or coerced, or that her will was overborne.

Once Agent Tietje discovered a hard, unnatural item in Ms. Alatorre-Verdugo's groin area there was probable cause to complete the search.  The agents did not believe her explanation that the anomaly was extra layers of underwear.  Ms. Alatorre-Verdugo was asked in Spanish what the object was. She did not answer and began exhibiting nervous behavior when discussing it with Agent Serna.  Based on the agents' training and experience, body carriers frequently wear extra layers of clothing to conceal packages of drugs and often conceal drugs in the groin area.  Even after Agent Serna instructed Ms. Alatorre-Verdugo to return to the shed and remove the extra layers of clothing, she did not protest.  She complied.  Agent Tietje did not touch her under her clothing, did not remove the underwear herself.  She touched the defendant only during the patdown search.  Ms. Alatorre-Verdugo removed the packages of drugs from her groin area and bra on her own.

The defendant argues that even if her consent was voluntary, the search went beyond the scope of consent because the search was not reasonable and was highly intrusive.  The defendant cites the Court to *Florida v. Jimeno*, 500 U.S. 248 (1991).  That case holds that for a consent search to comply with the Fourth Amendment it must be objectively reasonable in light of what a typical person would understand based on her exchange with the officer; it is an objective reasonableness test. *Id.* at 251.  Ms. Alatorre-Verdugo cites *U.S. v. Russell*, 664 F.3d 1279, 1282 (9th Cir. 2012) to support her argument that a search of the groin is only reasonable when it is to search for narcotics.  *Russell* quotes *Terry* and several other Circuit Courts to explain that general consent includes the groin area.  *Id.* at 1283-84.

In *Russell,* the Ninth Circuit held that the search was reasonable where the officer advised the defendant that he was looking for narcotics and the defendant was cooperative, never objecting, expressing concern, revoking consent or halting the search. Neither did the defendant complain to the officer after the search. The Court states that

"[t]he factual context[was] key to [its] decision. *Id.* at 1282. The Court stated that drugs are often hidden on the body in areas that make discovery difficult, including the groin area. The search in that case did not extend inside the clothing and was conducted by an officer of the same gender as the defendant. *Id.* The only distinguishing factor is that in the present case the agents did not advise Ms. Alatorre-Verdugo that they were searching for narcotics.

In arguing that the scope of the search exceeded the defendant's consent, the defendant appears to argue that because she was not specifically told the agents were asking to search for drugs she did not give valid consent. Russell does not stand for that proposition. There is no requirement that police advise the defendant what they are searching for. When agents asked to search Ms. Alatorre-Verdugo's body it was apparent they were looking for something that could be concealed on a person.

The patdown in this case was not excessively intrusive. It barely exceeded what people consent to daily when clearing security screenings in an airport. Both Agents Serna and Tietje communicated with the defendant verbally and through gestures regarding what was expected during the search. Ms. Alatorre-Verdugo did not complain, resist or withdraw consent at any stage of the search. "Consent can be inferred from nonverbal actions, but it must be 'unequivocal and specific' and 'freely and intelligently given.'" *U.S. v.* Basher, 629 F.3d 1161, 1167 (9th Cir. 2011 (citations omitted). Consent may also be inferred from the context. *Birchfield v. North* Dakota, 136 S.Ct. 2160, 2185 (2016). In the present case Ms. Alatorre-Verdugo's continued consent can be inferred from her continued compliance with verbal and nonverbal instructions from both agents. The search morphed from a consent search to a probable cause search once Agent Tietje felt the hard, unnatural object.

The defendant also argues that the search was unconstitutional because it did not comply with the Border Patrol's own procedures. Specifically the agents did not explain what was occurring during the search and did not follow protocol for a strip search. Agents are not required to follow internal procedures for a search to pass constitutional

muster. *See U.S. v. Caceres*, 440 U.S. 741, 749-50 (1979) ( where agency was not required by Constitution or statute to adopt particular procedures, violation of agency regulation is not a constitutional violation).

In this case, the agents did "explain the search process, in general terms, as the search progress[ed]," per the Border Protection National Standards Manual, section 3.3. The defendant acknowledges that the search in this case did not meet the strict definition of a strip search. (Doc. 79, p. 7, lns. 24-25). Ms. Alatorre-Verdugo's body was not exposed and no one touched her between the time of the patdown and her arrest. There is no evidence of bad faith on the part of the agents, or prejudice to the defendant, even assuming arguendo that the agents did not comply with their own internal policies.

**Conclusion** –

Ms. Alatorre-Verdugo was lawfully stopped at the immigration checkpoint. Her lack of eye contact during the immigration inspection did not rise to the level of reasonable suspicion to search her but raised Agent Serna's suspicions. The defendant was asked for consent to search, which she gave voluntarily and without hesitation. Between Agent Serna's explanations in Spanish and Agent Tietje's hand gestures, the defendant was advised of what she was expected to do and she complied. There was no overreaching on the part of the agents. There were no threats or promises. Once the object between Ms. Alatorre-Verdugo's legs was discovered during the patdown there was probable cause to search her. As the search progressed, Ms. Alatorre-Verdugo never objected or withdrew consent. When she felt uncomfortable, she made it known to Agent Tietje and the agent made an accommodation to provide a greater modicum of privacy.

The consent to search was voluntary. The search did not exceed the scope of the consent. Consent was never withdrawn. The evidence is admissible at trial.

**RECOMMENDATION**:

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY the motion to suppress evidence. (Doc.51)

Defense counsel may serve and file written objections within 14 days. If

objections are not timely filed, the party's right to de novo review may be waived. No reply to objections shall be filed unless leave is granted from the District Court.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

Dated this 27th day of June, 2018.

_Leslie A. Bowman_

Honorable Leslie A. Bowman
United States Magistrate Judge